**George HECKLER et al., Plaintiffs,**

**v.**

**Allan G. SHEPARD as Attorney General of the State of Idaho, et al., Defendants.**

**Civ. No. 2398.**

United States District Court
D. Idaho, E. D.

June 19, 1965.

842

Louis F. Racine, Jr., Pocatello, Idaho, for plaintiffs.

Allan G. Shepard, Atty. Gen. of Idaho, Boise, Idaho, Richard Weston, Asst. Atty. Gen. of Idaho, Boise, Idaho, for defendants.

Before KOELSCH, Circuit Judge, TAYLOR, Chief District Judge, and MATHES, District Judge.

PER CURIAM.

This is a class suit for declaratory and injunctive relief challenging the constitutional validity of Chapter 210 of the Idaho Session Laws of 1963. Federal-question jurisdiction under 28 U.S.C. § 1331 is invoked, as is jurisdiction under the Civil Rights Act. [28 U.S.C. § 1343 (3); 42 U.S.C. § 1983.]

By Chapter 210 the Idaho Legislature amended § 59–401 of the Idaho Code, adding the italicized portions of the complete statute which now reads as follows:

"59–401.   Form of oath—Loyalty oath.—

Before any *public* officer *or employee* elected or appointed to fill any office, created by the laws of the state of Idaho, enters upon the duties of his office, he must take and subscribe an oath, to be known as the official oath, which is as follows:

"I do solemnly swear (or affirm) that I will support the constitution of

the United States, and the constitution and the laws of this state; that I will faithfully discharge all the duties of the office of ———————

——————————— according to the best of my ability.

"I, ———————————, do further solemnly swear (or affirm) that I will support and defend the constitution of the United States and the constitution of the state of Idaho against all enemies, foreign or domestic; that I will bear true faith and allegiance to the constitution of the United States and the constitution of the state of Idaho; that I take this obligation freely, without any mental reservation or purpose of evasion; and that I will well and faithfully discharge the duties upon which I am about to enter.

"And I do further swear (or affirm) that I do not advocate, nor am I a member of any party or organization, political or otherwise, that now advocates the overthrow of the government of the United States or of the state of Idaho by force or violence or other unlawful means; that within the five (5) years immediately preceding the taking of this oath (or affirmation) I have not been a member of any party or organization, political or otherwise, that advocates the overthrow of the government of the United States or of the state of Idaho by force or violence or other unlawful means except as follows:

"(If no affiliation, write in the words 'No Exceptions') and that during such time as I hold the office of

I will not advocate nor become a member of any party or organization, political or otherwise, that advocates the overthrow of the government of the United States or of the state of Idaho by force or violence or other unlawful means. So help me God.

"And no other oath, declaration, or test, shall be required as a qualification for any public office or employment, except as otherwise provided by law.

"A failure or refusal to take and subscribe such oath shall make such person ineligible to hold such office or to receive compensation for the same.

"Public 'officer' and 'employee' includes every officer and employee of the state, University of Idaho, Idaho State College, every other college and every county, city, school district, and authority, including any department, division, bureau, board, commission, agency, or instrumentality of any of the foregoing." [Idaho Code, § 59–401, as amended by ch. 210, Idaho Session Laws (1963).]

Shortly following enactment of the 1963 amendments, the complaint herein was filed naming as plaintiffs more than one hundred persons, including both faculty and non-faculty personnel at the University of Idaho and Idaho State University, some of whom are alleged to be aliens; also several school principals and teachers of the Pocatello School District, an employee of the Idaho State Hospital, and others.

Joined as defendants are the Attorney General and the Secretary of State of Idaho, the Idaho State Board of Education, the Regents of the University of Idaho, the Presidents of the University of Idaho and of Idaho State University, and the Superintendent of the Pocatello School District.

Because the plaintiffs raise a substantial question as to whether § 59–401, as now amended, fails to meet the "due-process" requirements of the Fourteenth Amendment to the Federal Constitution, and seek to restrain the "execution and enforcement of such statute" upon the ground of claimed unconstitutionality, this three-judge Court was convened pursuant to the mandate of 28 U.S.C. §§ 2281 and 2284. Prior to trial of the merits, a preliminary injunction was issued upon

application, restraining enforcement pendente lite of the statute as amended; and this injunction has since remained in force.

■ It does not appear from the evidence before us, even after hearing the case on the merits, that any of the plaintiffs have been injured by operation of the challenged statute, or that any of them would actually be injured by its enforcement; nevertheless, in view of controlling precedent, the standing of plaintiffs to have the constitutional issues adjudicated here and now is no longer open to question. [See Cramp v. Board of Public Instruction, 368 U.S. 278, 82 S.Ct. 275, 7 L.Ed.2d 285 (1961); cf.: Shelton v. Tucker, 364 U.S. 479, 81 S.Ct. 247, 5 L.Ed.2d 231 (1961), with Baggett v. Bullitt, 377 U.S. 360, 84 S.Ct. 1316, 12 L.Ed.2d 377 (1964), and Dombrowski et al. v. Pfister, 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965).] Consequently, as the cause has been presented, we cannot know what dismissal policies or hearing procedures might have been utilized if the statute had ever been executed. The Federal constitutional questions raised must of necessity, therefore, be considered as addressed solely to the validity of the so-called "loyalty-oath" statute on its face, without reference to how the test oath might have been applied by Idaho officials charged with its enforcement.

Confronting immediately, then, the constitutional issue we regard as dispositive, the crucial question may be phrased as follows: Would discharge of an individual under this statute, by making "such person ineligible to hold such office or to receive compensation for the same" for failure or refusal to take and subscribe the test oath, satisfy the due-process requirements of the Fourteenth Amendment? More specifically, is a hearing required; and, if so, is such hearing made available?

It should be noted at the outset that the complete statutory oath has several distinct aspects. First among these is the requirement to swear (or affirm) allegiance to the United States of America and to the State of Idaho. We do not understand that this allegiance aspect of the oath is challenged here by others than the plaintiffs who are aliens.

The next aspect of the mandatory oath is a disclaimer, calling upon the oath-taker to declare that he neither (1) personally advocates, nor (2) is presently a member of any "party or organization" which now advocates, the overthrow of the government of the United States or of the State of Idaho "by force or violence or other unlawful means". With respect to the personal-advocacy category, the oath further requires a covenant that, throughout the period of employment by the State, the employee will never personally advocate such unlawful overthrow.

While the statute declares ineligible to hold State employment any person who fails or refuses to swear or affirm that he does not presently belong in either category (1) or (2) above, the oath goes on to call for (3) a disclaimer of past membership, at any time during the preceding five years, in "any party or organization * * * that advocates the overthrow of the government * * * by force or violence or other unlawful means"; and further calls for affirmative disclosure of all exceptions. Although disclosure of past membership does not appear in so many words to require discharge, any employee who refuses to make the mandatory sworn disclosure is nonetheless declared to be "ineligible to hold such office or to receive compensation for the same". Clearly, then, failure or refusal to take and subscribe any part of the oath works in legal effect an immediate discharge.

Because different constitutional questions are presented by the discharge of one who refuses to disclaim personal advocacy, as contrasted to the discharge of one who refuses to disclose present or past membership in "any party or organization * * *", we shall treat these two hypothetical situations separately, even though the statute unquestionably requires that the oath be taken and sub-

scribed in its entirety, and even though as a practical matter a State employee, who would not or could not embrace both, would almost surely refuse to take or subscribe the oath at all.

■ Turning first to general principles of the law governing discharge of public employees, we find that these have known continuing development in the courts, and have been articulated by the Supreme Court on a number of occasions. United Public Workers v. Mitchell, 330 U.S. 75, 67 S.Ct. 556, 91 L.Ed. 754 (1947), made it clear that the public servant has no right to work for the State or any public entity on his own terms; and, as the Court observed in Adler v. Board of Education, 342 U.S. 485, 72 S.Ct. 380, 96 L.Ed. 517 (1952):

"[Employees] may work for the school system upon the reasonable terms laid down by the proper authorities of New York. If they do not choose to work on such terms, they are at liberty to retain their beliefs and associations and go elsewhere." [342 U.S. at 492, 72 S.Ct. at 385.]

Subsequent elaboration suggests, however, that the public employee has rights of somewhat greater content than these general propositions would seem to indicate. For example:

"To draw from * * * [the language of United Public Workers and Adler] the facile generalization that there is no constitutionally protected right to public employment is to obscure the issue. * * * We need not pause to consider whether an abstract right to public employment exists. It is sufficient to say that constitutional protection does extend to the public servant whose exclusion pursuant to a statute is patently arbitrary or discriminatory." [Wieman v. Updegraff, 344 U.S. 183, 191–192, 73 S.Ct. 215, 97 L.Ed. 216 (1952).]

Moreover:

"The problem of balancing the State's interest in the loyalty of those in its service with the traditional safeguards of individual rights is a continuing one. To state that a person does not have a constitutional right to government employment is only to say that he must comply with reasonable, lawful, and nondiscriminatory terms laid down by the proper authorities." [Slochower v. Board of Higher Education, 350 U.S. 551, 555, 76 S.Ct. 637, 639, 100 L.Ed. 692 (1956).]

■ In keeping with these pronouncements, it is now settled that a public employee may be summarily discharged for "incompetence", or for "insubordination" in refusing to respond to questions properly posed. [See: Nelson v. Los Angeles County, 362 U.S. 1, 80 S.Ct. 527, 4 L.Ed.2d 494 (1959); Lerner v. Casey, 357 U.S. 468, 78 S.Ct. 1311, 2 L.Ed.2d 1423 (1958); Beilan v. Board of Public Education, 357 U.S. 399, 78 S.Ct. 1317, 2 L.Ed.2d 1414 (1958); cf., Konigsberg v. State Bar, 366 U.S. 36, 81 S.Ct. 997, 6 L.Ed.2d 105 (1961).] But no discharge of a public employee, which operates to bestow a "badge of disloyalty" or to create a "built-in inference of guilt", will be permitted without according the right to such hearing as is requisite to due process of law. [See: Slochower v. Board of Higher Education, supra, 350 U.S. 551, 76 S.Ct. 637; Wieman v. Updegraff, supra, 344 U.S. 183, 73 S.Ct. 215; Joint Anti-Fascist Refugee Committee v. McGrath, 341 U.S. 123, 71 S.Ct. 624, 95 L.Ed. 817 (1951); see also Cafeteria & Restaurant Workers Union, etc. v. McElroy, 367 U.S. 886, 898, 81 S.Ct. 1743, 6 L.Ed.2d 1230 (1961).]

■ And although the State may set its own high standards of qualification for employees, and may discharge employees who do not meet these standards [cf., e. g., Schware v. Board of Bar Examiners, 353 U.S. 232, 77 S.Ct. 752, 1 L.Ed.2d 796 (1957)], facts must first appear which bear some essential logical relationship to the prescribed standards, lest disqualification for employment be so unreasonable as to constitute a denial

of due process of law. [See: Shelton v. Tucker, supra, 364 U.S. 479, 81 S.Ct. 247; Slochower v. Board of Higher Education, supra, 350 U.S. 551, 76 S.Ct. 637; cf.: Schware v. Board of Bar Examiners, supra, 353 U.S. 232, 77 S.Ct. 752; Konigsberg v. State Bar, 353 U.S. 252, 77 S.Ct. 722, 1 L.Ed.2d 810 (1957).]

■ True, the basic fairness envisioned by "due process" does not compel a hearing in every case of discharge from public service [see Cafeteria & Restaurant Workers Union, etc. v. McElroy, supra, 367 U.S. at 898, 81 S.Ct. 1743]; still there must always be provision for that "protection of the individual against arbitrary action" which has been characterized as "the very essence of due process". [Ohio Bell Telephone Co. v. Public Utilities Commission, 301 U.S. 292, 302, 57 S.Ct. 724, 729, 81 L.Ed. 1093 (1937).] In the words of Mr. Justice Frankfurter concurring in Joint Anti-Fascist Refugee Committee v. McGrath, supra, 341 U.S. 123, 71 S.Ct. 624:

"Fairness of procedure is 'due process in the primary sense.' * * But 'due process,' unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and circumstances. Expressing as it does in its ultimate analysis respect enforced by law for that feeling of just treatment which has been evolved through centuries of Anglo-American constitutional history and civilization, 'due process' cannot be imprisoned within the treacherous limits of any formula. Representing a profound attitude of fairness between man and man, and more particularly between the individual and government, 'due process' is compounded of history, reason, the past course of decisions, and stout confidence in the strength of the democratic faith which we profess. Due process is not a mechanical instrument. It is not a yardstick. It is a process. It is a delicate process of adjustment inescapably involving the exercise of judgment by those whom the Constitu-

tion entrusted with the unfolding of the process." [341 U.S. at 161–163, 71 S.Ct. at 643–644.]

Considering now the hypothecated case of discharge of a State employee for failure or refusal to take and subscribe that aspect of the oath dealing with personal advocacy, it must be borne in mind that, because of the manner in which this constitutional issue is permitted to be presented, we cannot of course know any actual facts surrounding this termination of public employment for the reason stated. So we must assume, in order to test the necessity for a hearing prerequisite, that discharge was automatic upon noncompliance, without more; for the statute does not require more.

Where termination of public employment is automatic, "[i]t matters not whether the * * * [failure or refusal] resulted from mistake, inadvertence or legal advice conscientiously given, whether wisely on unwisely". [Slochower v. Board of Higher Education, supra, 350 U.S. at 558, 76 S.Ct. at 641.] Nor does it matter whether refusal to take and subscribe the oath happens to be grounded upon the constitutional guarantee against self-incrimination [see Slochower v. Board of Higher Education, supra, 350 U.S. 551, 76 S.Ct. 637], or happens to rest upon honest belief that the United States Constitution prohibits such inquiry as the oath ex necessitate makes into a person's thoughts and speech. [Cf., Konigsberg v. State Bar, supra, 353 U.S. 252, 77 S.Ct. 722.]

For here, we repeat, discharge is automatic: there is no concern for the employee's reasons; whether they are with or without justification; whether they are founded upon claimed constitutional guarantees. Even if a public employee holds steadfast conviction that the Federal Constitution shields him from being compelled to make the disclosures required, the Idaho statute accords but two alternatives: either to take the oath, or to suffer summary discharge from State employment.

Discharge under the statute at bar is thus distinguishable from those cases wherein discharge (or denial of application) has been predicated upon refusal of the individual to respond to questions properly propounded. The line drawn in Nelson v. Los Angeles County, 362 U.S. 1, 80 S.Ct. 527, 4 L.Ed.2d 494 (1959), turns upon a close distinction indeed; and we do not attempt here to enunciate any all-inclusive governing test. We do, however, note particularly that in each of the cases which sustain dismissal (or denial of application) after refusal to respond, the individual involved was accorded the opportunity to delineate formally, for the record, the reasons for his non-response. [See: Nelson v. Los Angeles County, supra, 362 U.S. 1, 80 S.Ct. 527; Lerner v. Casey, supra, 357 U.S. 468, 78 S.Ct. 1311; Beilan v. Board of Public Education, supra, 357 U.S. 399, 78 S.Ct. 1317; cf., Konigsberg v. State Bar, supra, 366 U.S. 36, 81 S.Ct. 997.]

The inquiry there made of the individual confronted him, therefore, with no fewer than three alternatives: to respond and avoid discharge; to remain silent and accept the consequences; or to make formal record at a hearing of the reasons for not responding. The Idaho statute does not provide the third alternative just stated; and therein we think lies both the distinction and the constitutional infirmity. The distinction consists in the fact that the statute does not require that the State employee be given an opportunity to make a public record of his reasons for refusing to take and subscribe the oath; while the constitutional infirmity consists in the fact that, absent some provision for a hearing prior to discharge, the public employee has no opportunity to rebut the treacherous implication of disloyalty against which the test oath is directed.

■ As in Slochower v. Board of Higher Education, supra, 350 U.S. 551, 76 S.Ct. 637, so in the case at bar, where termination of public employment is automatic, a failure or refusal to take the oath, irrespective of motive or reason or claimed justification or excuse, inexorably results in summary discharge, without a hearing. Thus an inference of guilt is in effect built into the law— simply because the statute fails to meet the fair requirement of a hearing prior to discharge. For it is a fact of common knowledge, of which we take judicial notice, that where dismissal automatically follows failure to take and subscribe a "test oath", the inevitable assumption of the community is that the employee failed the "test". So it is that the Idaho loyalty-oath statute, as now drafted, unavoidably presupposes unlawful advocacy on the part of each noncomplying individual. Discharge without a hearing under these circumstances presents a clear case where "government action has operated to bestow a badge of disloyalty or infamy, with an attendant foreclosure from other employment opportunity". [Cafeteria & Restaurant Workers Union, etc. v. McElroy, supra, 367 U.S. at 898, 81 S.Ct. at 1750.]

■ These considerations give answer to the contention that a hearing prior to discharge would be a vain and useless thing because the single plain meaning of the statute is that discharge must result from failure for any reason to take and subscribe the oath. Such a contention entirely overlooks the fact that the purpose of requiring a hearing prior to discharge is not to protect State employment for a person who persists in refusing to take and subscribe the oath as the statute commands, but rather to afford the State employee a fair opportunity, prior to his discharge, to place formally of record, for the sake of future employment, the reasons for his refusal.

As Mr. Justice Stewart recently put it in Armstrong v. Manzo, 380 U.S. 545, 85 S.Ct. 1187, 14 L.Ed.2d 62 (1965): "A fundamental requirement of due process is 'the opportunity to be heard.' * * * It is an opportunity which must be granted at a meaningful time and in a meaningful manner." [380 U.S. at 552, 85 S.Ct. at 1191.]

We therefore conclude that the case hypothecated, namely, that of a State em-

ployee discharged without a hearing for failure to take and subscribe that aspect of the oath respecting personal advocacy, is governed by Slochower v. Board of Higher Education, supra, 350 U.S. 551, 76 S.Ct. 637. Accordingly, we hold that dismissal in these circumstances violates those principles of fundamental fairness embodied in the concept of "due process of law" required of all State action by virtue of the Fourteenth Amendment; and that to meet this defect, the Idaho loyalty-oath statute must accord opportunity for a formal hearing in advance of discharge as a fixed prerequisite to termination of State employment for failure or refusal to take and subscribe the required oath.

The conclusion just stated is buttressed by an alternate rationale which leads to the same result. [See: Adler v. Board of Education, supra, 342 U.S. at 494–496, 72 S.Ct. 380; cf.: Konigsberg v. State Bar, supra, 353 U.S. at 258–274, 77 S.Ct. 722; Schware v. Board of Bar Examiners, supra, 353 U.S. at 239, 77 S.Ct. 752.] The constitutional infirmity argued in Adler v. Board of Education was absence of any essential logical relationship between the fact found and the presumption following therefrom; which presumption resulted in discharge. In the case at bar, as contrasted to Adler, the fact found (that the employee has failed or refused to take and subscribe the required oath) bears no essential logical relationship to the fact presumed (that the employee advocates unlawful overthrow of the government); but the fact presumed alone results in summary discharge.

To argue that the legislated discharge was intended to follow for any reason other than presumed disloyalty of the State employee is but an exercise in hyperbole. Personal advocacy of the unlawful overthrow of a government unquestionably bears a clear and essential logical relationship to the qualifications of a public servant; and a "test oath", such as here involved, is an easily-administered albeit perhaps doubtfully effective method of confirming the loyalty of pub-

lic employees. There has been no suggestion that the Idaho loyalty-oath statute is intended to serve any further function. To the contrary, it seems clear that the challenged oath is devoted exclusively to discovery of the subversive inclinations of State employees. And there is no language in either the oath or the accompanying statute which would permit this Court to conclude that any presumption, or any inference, other than that of disloyalty was intended to arise from the mere fact of failure or refusal to take and subscribe the oath.

■ The alternative rationale is, then, that summary discharge based upon such a deduction of disloyalty under the Idaho loyalty-oath statute, without the requirement of an opportunity for a formal hearing, would be "arbitrary" action within the "due-process" clause of the Fourteenth Amendment.

■ It now remains for us to consider whether a hearing is required in the hypothetical case of summary dismissal for failure or refusal to take and subscribe that aspect of the Idaho test oath relating to present or past membership in a "party or organization" advocating violent overthrow. Judicial notice of the various roles the individual may play in an organization dedicated to group advocacy makes it even more apparent that "due process" requires opportunity for a formal hearing prior to discharge, even where the membership is current; and *a fortiori* where only past membership is involved.

■ It has long been recognized that any "party or organization", bent upon changing by revolution lawfully-established government, may profess principles and engage in activities that are lawful as well as unlawful. For this reason, an individual may not be punished for mere passive membership in a subversive group. The law recognizes that he may be simply a visionary, an idealist, or a dreamer. [See: Noto v. United States, 367 U.S. 290, 81 S.Ct. 1517, 6 L.Ed.2d 836 (1961); Scales v. United States, 367 U.S. 203, 227–228, 81 S.Ct.

1469, 6 L.Ed.2d 782 (1961); DeJonge v. State of Oregon, 299 U.S. 353, 57 S.Ct. 255, 81 L.Ed. 278 (1937).]

If the rule were otherwise, a member "in sympathy with the legitimate aims of such an organization, but not specifically intending to accomplish them by resort to violence, might be punished for his adherence to lawful and constitutionally protected purposes, because of other and unprotected purposes which he does not necessarily share". [Noto v. United States, supra, 367 U.S. at 299–300, 81 S.Ct. at 1522.]

We are aware, of course, that both Scales and Noto involve convictions under a criminal statute—the membership clause of the Smith Act. [18 U.S.C. § 2385.] But the principle they declare— that guilt may not be found from mere association with a non-conspiratorial enterprise, without more—is no less applicable here. We have already adverted to the fact that unexplained refusal to take an oath of the kind prescribed by the Idaho statute may be as injurious to the State employee as a criminal conviction: he is summarily discharged, his future employment opportunities are jeopardized, and the shadow of assumed or presumed disloyalty is permanently cast upon his character. So also with respect to the membership aspect of the oath; the statute would operate indiscriminately to render ineligible, without a hearing, the member whose advocacy is or was that of abstract doctrine, as well as the member who actively participates in advocating and attempting to incite concrete subversive action.

Having already concluded that the Idaho statute fails to meet the "due-process" requirements of the Fourteenth Amendment, because discharge automatically follows failure or refusal to take and subscribe the required oath without any provision requiring a hearing whereat the State employee would be given the opportunity to make a formal record of the reasons for his failure or refusal, we now also hold that a hearing is constitutionally compelled, prior to discharge, in order to determine the nature and quality of an indvidual's membership, present or past, in a "party or organization" proscribed by the statute. [See Nostrand v. Little, 362 U.S. 474, 80 S.Ct. 840, 4 L.Ed.2d 892 (1960).]

Argument that the Idaho Legislature must have intended the loyalty-oath statute to be supplemented by another or others, which would provide what this one lacks, must fall of its own weight. The statute at bar [Idaho Code, § 59–401] in express terms broadly applies to "any public officer and employee * * *"; and these plaintiffs represent several diverse classes. Idaho has no administrative procedure act which applies to all public employees generally. Statutes other than § 59–401 do grant hearings to the classes of plaintiffs represented by the principals and teachers in the elementary schools, and by the records clerk at the Idaho State Hospital. But these do not apply to the faculty members at the University of Idaho, or to their counterparts at Idaho State University.

The evidence adduced at the trial discloses that the Board of Regents of the University of Idaho has promulgated administrative regulations (appearing in The University Handbook of Policy and Procedure), which provide a hearing to those discharged "before the completion of a term employment". However, there does not appear to be any statutory requirement for such a hearing. And § 33–2806 of the Idaho Code provides that:

"The board of regents shall have power to remove the president or any professor, instructor or officer of the university, when, in their judgment, the interests of the university require it. * * *"

When the Idaho Supreme Court had occasion, in Hyslop v. Board of Regents, 23 Idaho 341, 129 P. 1073 (1913), to consider the nature of the power thus vested in the Board, it declared:

"That provision of said section is a part of the contract of employment of any of the persons therein named, and the Board of Regents are thereby given plenary power to remove any of the employés therein named,

whenever they may think best to do so." [23 Idaho at 343, 129 P. at 1074.]

Of course, "[a] statute must be construed, if fairly possible, so as to avoid not only the conclusion that it is unconstitutional, but also grave doubts upon that score". [United States v. Jin Fuey Moy, 241 U.S. 394, 401, 36 S.Ct. 658, 659, 60 L.Ed. 1061 (1916).] "But avoidance of a difficulty will not be pressed to the point of disingenuous evasion" [George Moore Ice Cream Co. v. Rose, 289 U.S. 373, 379, 53 S.Ct. 620, 622, 77 L.Ed. 1265 (1933)]; and "[t]o supply omissions transcends the judicial function" [Iselin v. United States, 270 U.S. 245, 251, 46 S.Ct. 248, 250, 70 L.Ed. 566 (1926)]. Moreover, as plaintiffs point out, the provision in § 59–401, repealing all "conflicting legislation", hardly comports with a legislative desire nonetheless to resort to statutes and procedures supplemental to the oath.

The foregoing conclusions would normally constitute our entire consideration of the issues of law presented. But since our opinion is intended to serve as findings of fact and conclusions of law in this action, as permitted by Rule 52(a) of the Federal Rules of Civil Procedure, we find it necessary to make the following additional conclusions of law:

(1) The Attorney General of Idaho has assured this Court that he would construe and apply the loyalty-oath statute to require knowledge on the part of the individual affected of the wrongfulness of his act. We assume, therefore, as did the Supreme Court under like circumstances in Garner v. Board of Public Works of City of Los Angeles, 341 U.S. 716, 71 S.Ct. 909, 95 L.Ed. 1317, "that scienter is implicit in each clause of the oath". [341 U.S. at 724, 71 S.Ct. at 914.]

(2) In light of the conclusion just stated, upon consideration of the language of the statute itself, the challenged statute is not "void for vagueness". [See: Cramp v. Board of Public Instruction, supra, 368 U.S. at 286, 82 S.Ct. 275; American Communications Association v. Douds, 339 U.S. 382, 70 S.Ct. 674, 94 L.Ed. 925 (1950); cf., Baggett v. Bullitt, supra, 377 U.S. 360, 84 S.Ct. 1316.]

(3) The loyalty-oath statute is neither a bill of attainder nor an ex post facto law. [Garner v. Board of Public Works of City of Los Angeles, supra, 341 U.S. 716, 71 S.Ct. 909; see Act of June 25, 1948, 62 Stat. 808, as amended by 70 Stat. 623 (1956), and by 76 Stat. 103 (1962); 18 U.S.C. § 2385.]

(4) Because the oath-of-allegiance aspect of the challenged statute may have a highly undesirable effect upon the ability of the two Idaho universities to attract foreign scholars to their campuses, its application to the alien professors who are among the plaintiffs at bar may indeed be unfortunate. It appears from the proceedings before this Court that all concerned are most anxious to resolve this obvious problem. So the issue is perhaps moot. In these circumstances we decline to adjudicate the merits of the issue sought to be presented. [See Poe v. Ullman, 367 U.S. 497, 81 S.Ct. 1752, 6 L.Ed.2d 989 (1961).]

The attorneys for plaintiffs will serve and lodge with the Clerk within ten days a form of judgment not inconsistent with this opinion, awarding declaratory and injunctive relief, with provision that all parties shall bear their own costs.

KOELSCH, Circuit Judge (concurring and dissenting).

I agree with the court to the extent that it holds violative of due process the portion of the statute that would automatically disqualify for public employment the individual simply because of his membership past or present in a subversive party or organization. But in my estimation this taint does not extend to or render inoperable the remainder of the statute which the Legislature ex-

pressly stated should survive, even if some part of the whole was judicially declared invalid.

The court declares that the individual advocacy portion of the official loyalty oath fails the test of due process, because " * * * the public employee (not being afforded a hearing) has no opportunity to rebut the treacherous implication of disloyalty against which the test oath is directed." This reasoning, I submit, is based upon a misconception. The basis for the disqualification is not an inference that the individual is disloyal, but rather his refusal to answer. The State may not be held responsible for all consequences of the individual's refusal to give information regarding matters of legitimate employer concern. Any "implication of disloyalty" stems not from state commission or omission; rather it is purely the product of the individual's refusal to submit to a reasonable inquiry propounded by the State. As such, it is not subject to constitutional redress; the Constitution concerns itself solely with state, not individual action.

Mr. Justice Frankfurter, concurring in Beilan v. Board of Public Education, 357 U.S. 399, 410–411, 78 S.Ct. 1317, 1324–1325, 2 L.Ed.2d 1414 (1958) discussed and persuasively laid to rest the same argument presently made by this court. After stating that,

"The services of two public employees have been terminated because of their refusals to answer questions relevant, or not obviously irrelevant, to an inquiry by their supervisors into their dependability,"

he carefully noted that,

"When these two employees were . discharged, they were not labeled 'disloyal.' They were discharged because governmental authorities, like other employers, sought to satisfy themselves of the dependability of employees in relation to their duties. Accordingly, they made inquiries that, it is not contradicted, could in and of themselves be made. These inquiries were balked. The services of the employees were therefore terminated.

"Because the specific questions put to these employees were part of a general inquiry relating to what is compendiously called subversion and to conduct that on due proof may amount to disloyalty, every part of the process of inquiry is given the attribute of an inquiry into disloyalty and every resulting severance from service is deemed a finding of disloyalty. The argument runs, in essence, that because such an inquiry may in certain instances lead to a determination of disloyalty, the refusal to answer any questions in this process and dismissal therefor themselves establish disloyalty. To make such an attribution to a State, to draw such an inference from a carefully limited exercise of state power, to disallow state action because there are those who may draw inferences that the State itself has not drawn and has avoided drawing, is a curbing of the States through the Fourteenth Amendment that makes of that Amendment an instrument of general censorship by this Court of state action. In refusing to put the Fourteenth Amendment to such a use, I am of course wholly unconcerned with what I may think of the wisdom or folly of the state authorities. I am not charged with administering the transportation system of New York or the school system of Pennsylvania. The Fourteenth Amendment does not check foolishness or unwisdom in such administration. The good sense and right standards of public administration in those States must be relied upon for that, and ultimately the electorate."

See also, Nelson v. Los Angeles County, 362 U.S. 1, 80 S.Ct. 527, 4 L.Ed.2d 494 (1960) and Cafeteria and Restaurant Workers Union, etc. v. McElroy, 367 U.S.

886, 81 S.Ct. 1743, 6 L.Ed.2d 1230 (1961).[1]

In short, the court should hold in this case that the State of Idaho cannot constitutionally be required to provide hearing procedures to afford an individual the opportunity to "rebut" an implication for which it bears no responsibility.

---

1. It is interesting to note that the "badge of disloyalty" argument was made in Beilan even though the teachers were granted a hearing to explain their views. Under the rationale employed by the court in this case, the statute could still be found constitutionally infirm even if the state provided a hearing.